IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE INSTAGRAM ACCOUNT ASSOCIATED WITH USER NAME **"professorglockz"** | **UNDER SEAL**<br><br>Case No. 1:22-sw-308 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Samuel F. Supnick, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain Instagram account associated with the user name "**professorglockz**" that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), an electronic communications service and/or remote computing service provider headquartered at 1601 Willow Road in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Meta to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.     I am "an investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am an officer of the United

1

States who is empowered by law to conduct investigations of and make arrests for the offenses enumerated in Titles 18, 21, and 26 of the United States Code.

3.      I have been a Special Agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") since 2017. Through the ATF, I attended the Criminal Investigator Training Program at the Federal Law Enforcement Training Center, as well as the Special Agent Basic Training Program at the ATF National Academy. During these programs, I received training regarding the investigation of violations of federal firearms, narcotics, explosives, and arson statutes. Prior to employment with ATF, I served for approximately three and a half years as an officer with Montgomery County, Maryland Police Department. My training and experience has involved, among other things: (1) the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the purchase, possession, distribution, and transportation of firearms and controlled substances and of the laundering and concealment of proceeds of firearms and drug trafficking; (2) surveillance; (3) analysis and processing of documentary, electronic, and physical evidence; (4) the legal and illegal purchase of firearms; (5) the execution of arrest and search warrants seeking firearms and narcotics (6) and firearms trafficking.

4.      This affidavit is intended to show only that there is probable cause for the requested warrant and does not set forth each and every fact learned during the course of this investigation. Facts not set forth herein are not being relied upon in this affidavit in support of the warrant. I make this affidavit based, in part, on my personal knowledge and observations derived from my participation in this investigation, my background and experience as a Special Agent of the ATF, information provided by other agents and law enforcement officers, reports and data provided by other officers which I have read and reviewed, and, in part, upon information and belief.

5.     The statements contained in this affidavit are based, in part, on information provided by Special Agents and/or Task Force Officers of the ATF and other law enforcement officers, and on my background and experience as a Special Agent of the ATF.

6.     This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. § 922(g)(1) (felon in possession of a firearm and/or ammunition), Title 18 U.S.C. § 924(c) (use or carrying of a firearm in relation to or in furtherance of a drug trafficking crime), and Title 21 U.S.C. § 841(a)(1) (distribution of a controlled substance)  have been committed by Ajee WHITTER, also known as "Glockz," (hereinafter "WHITTER") and his associates.  There is also probable cause to search the information described in Attachment A for fruits, evidence, and instrumentalities of these crimes further described in Attachment B.

## **JURISDICTION**

8.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

### First Undercover Purchase

9.      On March 30, 2022, a Fairfax County Police Department ("FCPD") Detective acting in an undercover capacity (hereinafter, "Det. 1"), contacted WHITTER via the telephone number 571-477-7906 to arrange for the purchase of cocaine.  WHITTER agreed to sell Det. 1 an "eight ball" of cocaine for two hundred and seventy-five dollars ($275).  An "eight ball" is a street term known by your Affiant via his training, knowledge, and experience to refer to one-eighth (1/8) of an ounce, or approximately three and a half (3.5) grams.  Det. 1 and WHITTER arranged to meet at the Hooters restaurant, located at 14441 Brookfield Tower Drive, Chantilly, Virginia. This location is within the Eastern District of Virginia.  WHITTER advised Det. 1 that he was waiting on a driver and would be on the way to Det. 1 after being picked up.

10.     While Det. 1 was waiting for WHITTER, he received a call from an unknown subject telling Det. 1 to meet him in the bathroom.  Det. 1 then observed a tall black male, later identified as Quinton MOORE (hereinafter, "MOORE"), enter the restaurant and ask the hostess for the location of the bathroom.  Det. 1 met MOORE in the bathroom and exchanged two hundred and seventy-five dollars ($275) in pre-recorded law enforcement buy funds for a small bag of suspected cocaine.  Det. 1 also observed MOORE smoke a suspected fentanyl pill before leaving the bathroom.  MOORE was on the phone with another male subject who told MOORE to count the money and make sure it was two hundred and seventy-five dollars ($275).  Det. 1 noted that the voice sounded similar to that of WHITTER.  MOORE told Det. 1 that if he wanted more then he should contact WHITTER, but that MOORE would be the one who served Det. 1.  MOORE left the restaurant and was seen entering the back seat of a Cadillac Escalade registered to a

limousine service.   FCPD personnel later weighed the purchased suspected cocaine, which weighed 3.7 grams.  The suspected cocaine was also field tested, with positive results.

### Second Undercover Purchase

11.     On April 11, 2022, Det. 1 unsuccessfully attempted to contact WHITTER via phone and text message.  Det. 1 contacted MOORE, who advised that WHITTER's phone was broken, and WHITTER was using MOORE's phone in the interim.  Det. 1 arranged to purchase three and a half (3.5) grams of cocaine and five (5) pressed fentanyl pills from WHITTER/MOORE for five hundred dollars ($500).  Det. 1 was told to meet at the Beacon of Groveton apartment building, located at 6870 Richmond Highway, Alexandria, Virginia.  This location is also within the Eastern District of Virginia.

12.     When Det. 1 arrived at the above location, he observed a Cadillac Escalade parked next to a silver or gray BMW sedan, with three black males standing in between the two vehicles.  Det. 1 recognized one of the males as MOORE.  Det. 1 also observed that another of the subjects resembled WHITTER and was later identified as such.  The third subject was later identified as Delondre FREEMAN (hereinafter "FREEMAN").

13.     Det. 1 notified MOORE of his arrival, and MOORE verified the vehicle Det. 1 was driving.  Det. 1 then observed MOORE retrieve something from WHITTER and the other male and walk toward Det. 1's vehicle.  MOORE directed Det. 1 to meet him in the parking garage for the apartments.  Det. 1 followed MOORE into the garage on foot.  Once inside the garage, MOORE asked Det. 1 for the money.  Det. 1 replied that he needed to see the drugs first.  MOORE pointed to a plastic bag and loose pills sitting next to a traffic cone on the ground.  Det. 1 provided MOORE with $500 in pre-recorded funds.  MOORE then walked back to the parked vehicles and entered the driver's seat of the BMW sedan.  WHITTER and FREEMAN entered the Escalade.  As the

vehicles began to leave the parking lot, FCPD personnel moved in to arrest MOORE, WHITTER, and FREEMAN.

### Arrests of MOORE, WHITTER, and FREEMAN

14.     MOORE was taken into custody after ramming a police vehicle and fleeing first in a vehicle and then on foot.  Several suspected fentanyl pills were located on MOORE's person.

15.     FCPD personnel stopped the Escalade at the location of the undercover purchase. The occupants of the Escalade at the time it was stopped were its driver, who was determined to be uninvolved, WHITTER, and FREEMAN.  WHITTER was observed by one or more FCPD detectives throwing a black satchel into the back of the vehicle.  The satchel was found to contain a Polymer80, model PF940C, 9x19mm caliber pistol bearing no serial number.  The pistol was loaded with a drum-type magazine at the time of its recovery and an additional magazine was located in the satchel.  Also in the satchel was approximately nine to ten grams of suspected cocaine.  At the time of his arrest, WHITTER was found to be in possession of the five hundred dollars ($500) in pre-recorded funds from the preceding transaction between MOORE and Det. 1.

16.     At the time of his arrest, FREEMAN was seated in the middle row of the Escalade. FCPD personnel observed FREEMAN bent forward but were unable to see his hands.  At FREEMAN's feet and pushed under the front passenger seat was a Glock, model 22, .40 S&W caliber pistol, bearing serial number BGWY915.  Next to the firearm was an orange pill bottle containing approximately seventy (70) suspected pressed fentanyl pills.  Also located in the middle seat area of the vehicle was a small black bag containing approximately two (2) grams of suspected cocaine and a white pill bottle containing half of a suspected oxycodone pill.

17.     MOORE, WHITTER, and FREEMAN were transported to a law enforcement facility to be interviewed.  It was later learned through record checks that FREEMAN and WHITTER were previously convicted felons.

### Interviews

18.     FCPD detectives interviewed WHITTER, FREEMAN, and MOORE in reference to the investigation.  All three subjects were advised of their *Miranda* rights, and the interviews were audio recorded.  Both WHITTER and FREEMAN denied involvement in illegal activity and attempted to place the blame on MOORE.

19.     During his interview, MOORE advised that WHITTER provides him with drugs to sell.  MOORE stated that he provides WHITTER with the proceeds of these drug transactions and WHITTER repays MOORE in small amounts of drugs.  MOORE admitted to selling drugs twice to Det. 1, on the above two occasions, at the direction of WHITTER.  MOORE confirmed that WHITTER's phone is broken, so he was using MOORE's phone to set up the deals with Det. 1.  MOORE also advised that FREEMAN may have had Percocet pills concealed on or in his person and that the other pills MOORE had at arrest were to be sold to another person.

20.     MOORE further advised that, on April 11, 2022, WHITTER directed MOORE to drive the gray BMW.  MOORE was told the vehicle was owned by FREEMAN.  WHITTER and FREEMAN were in a rented Cadillac Escalade.  Prior to the deal with Det. 1, MOORE collected the drugs from WHITTER and placed them on the ground in the garage.  MOORE then motioned for Det. 1 to come do the exchange.  After the exchange, MOORE returned to WHITTER and provided him with the money from the buy.  WHITTER then directed MOORE to get in the BMW and follow WHITTER and FREEMAN.  At that point they were detained by FCPD personnel.

21.     MOORE further stated that he currently lives with WHITTER and had been staying there on an air mattress in the living room.  MOORE told detectives that he believed there to be approximately thirty-two (32) grams of cocaine in the apartment.

**Search Warrant at 7101 Mint Place, #102**

22.     FCPD personnel obtained and executed a search warrant at 7101 Mint Place, #102, Alexandria, Virginia, which is within the Eastern District of Virginia.  MOORE identified this residence as a location where he and WHITTER were currently residing.  Inside one bedroom of the apartment, FCPD detectives located a Tupperware containing approximately thirty (30) grams of a white powdery substance, a bag containing approximately one hundred and fifty-one (151) unknown tablets, a scale with white powder, and checkbooks/credit cards belonging to other persons.

23.     WHITTER, FREEMAN, and MOORE were all charged locally.

**Criminal Histories of MOORE, WHITTER, and FREEMAN**

24.     Via a review of law enforcement records, your Affiant determined that MOORE is not a previously convicted felon but has previous felony arrests and misdemeanor convictions in the Commonwealth of Virginia.

25.     Via a review of law enforcement records, your Affiant determined that WHITTER has been previously convicted of the following felony offenses in the Commonwealth of Virginia: Grand Larceny, Robbery, and four (4) instances of probation violations on felony offense.

26.     Via a review of law enforcement records, your Affiant determined that FREEMAN has been convicted of the following felony offenses in the Commonwealth of Virginia: Petit Larceny, Third or Subsequent and Grand Larceny.

8

**Test Fire of Polymer80 Pistol**

27.     On May 4, 2022, your Affiant met with Det. 1, who test-fired the above-referenced Polymer80 pistol that was found in the black satchel thrown by WHITTER. Your Affiant observed that the firearm functioned as designed. Det. 1 later provided your Affiant with photographs of several rounds of 9mm ammunition recovered from the magazines in the pistol and satchel. Your Affiant observed that the headstamps of the ammunition were those of manufacturers not located in the Commonwealth of Virginia.

**Identification of Instagram account "professorglockz"**

28.     On May 6, 2022, a detective with the Prince William County Police Department ("PWCPD") (hereinafter, "Det. 2") provided your Affiant with six (6) photographs of an Instagram account with the screenname "professorglockz," that Det. 2 believed was being used by WHITTER.  In December 2018, Det. 2 had received an anonymous tip via the ATF Tip Line that identified WHITTER as a gang member and felon. A photograph of the "professorglockz" Instagram account was included with the tip.  Det. 2 had also received other information in 2017 that WHITTER was involved with firearms, though WHITTER was using a different Instagram username at that time.   Det. 2 advised he had submitted a preservation notice for the "professorglockz" Instagram account approximately one (1) month prior.

29.     Your Affiant searched Instagram and was unable to locate an active account with that name.  In reviewing the photographs provided by Det. 2, your Affiant observed a firearm in two of the photographs which was consistent in appearance with the above-referenced Polymer80 pistol found in the black satchel thrown by WHITTER.  One of the two photographs depicting the firearm also depicts approximately one hundred and thirty dollars ($130) in United States currency and a bottle consistent in appearance with those used to hold promethazine-codeine cough syrup.

9

The same photograph also depicts a bottle of an orange beverage. Based on your Affiant's knowledge and experience, promethazine-codeine is commonly consumed mixed with a soda or other beverages. Below are the above-referenced photographs provided by Det. 2:




<u>Below are photographs of the recovered Polymer80 pistol taken by your Affiant on May 4, 2022:</u>





30.     In a third photograph provided by Det. 2, and seen below, your Affiant observed a person consistent in appearance with WHITTER holding what appears to be a firearm with characteristics similar to that of the recovered firearm—specifically, similar coloring, shape, and a weapon-mounted light.



31.     On May 12, 2022, Det. 2 advised your Affiant that the initial preservation notice which had been submitted on the referenced Instagram account was likely to expire soon.  As such, your Affiant submitted a new preservation notice to Meta for the said account.

## TECHNICAL INFORMATION CONCERNING INSTAGRAM

32.     Based on my training and experience, information acquired from other law enforcement officials with technical expertise, and from my review of publicly available information provided by Instagram about its service,[1] I am aware of the following about Instagram and about the information collected and retained by Instagram.

33.     Instagram is a service owned by Meta, a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510.  Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the target account listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

34.     Meta collects basic contact and personal identifying information from users during the Instagram registration process.  This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers.  Meta keeps records of changes made to this information.

---

[1] The information in this section is based on information published by Meta on its Instagram website, including, but not limited to, the following webpages: "Data Policy," https://help.instagram.com/519522125107875; "Information for Law Enforcement," https://help.instagram.com/494561080557017; and "Help Center," https://help.instagram.com.

35. Meta also collects and retains information about how each user accesses and uses Instagram. This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

36. Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time. Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

37. Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account. Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality. For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image from Instagram to a connected image printing service. Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

38. Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers). Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments. Instagram also

allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

39.     Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users.  Meta retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions.  Users can similarly allow Meta to search an associated Facebook account for friends who are also Instagram users.  Users can also manually search for friends or associates.

40.     Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings.  Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

41.     One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos.  Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location.  These appear as posts on the user's profile.  Users can remove posts from their profiles by deleting or archiving them.  Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

42.     Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram.  Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@").  An Instagram post created by one user may appear on

the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

43.     An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours.  Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted.  The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

44.     Instagram allows users to broadcast live video from their profiles.  Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

45.     Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups.  These messages may include text, photos, videos, posts, profiles, and other information.  Participants to a group conversation can name the group and send invitations to others to join.  Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings.  Senders cannot view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot.  Instagram Direct also enables users to video chat with each other directly or in groups.

46.     Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps.  Instagram collects and

retains payment information, billing records, and transactional and other information when these services are utilized.

47.    Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag.  Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram.  Meta retains records of a user's search history and followed hashtags.

48.    Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

49.    Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content.  Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers.  This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

50.    In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

51. For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

52. In my training and experience, evidence of who was using Instagram and from where, and evidence related to criminal activity of the kind described in ¶¶29-32 above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.  Specifically, in this investigation, the photographs shared privately and publicly, messages, and user information may assist law enforcement in identifying and confirming the identities of other persons involved in the larger narcotics conspiracy, as well as potential traffickers and/or illegal possessors of firearms and ammunition.

53. For example, the stored communications and files connected to an Instagram account may provide direct evidence of the offenses under investigation.  Based on my training and experience, instant messages, voice messages, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Based on the images already seen by your Affiant, the referenced Instagram account was used to document the apparent illegal possession of firearms and narcotics.

54. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Meta can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, messaging logs, photos, and videos (and the data associated with the foregoing, such as date and time) may be evidence of who

18

used or controlled the account at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.  Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.  Additionally, Instagram builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Instagram "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Instagram account owner.  Your Affiant plans to seek a Federal arrest warrant for one or more persons identified in this investigation, and one or more of the persons arrested by FCPD is no longer in local custody. As such, the geographic locations identified through information obtained via this warrant will also assist law enforcement in re-locating and apprehending the subjects once arrest warrants are obtained.

55.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement). This is evidenced by your Affiant's inability to locate the referenced Instagram account in a recent search, which indicates to your Affiant that the account has since been deleted, made inactive, or otherwise had its privacy settings changed.

56.     Other information connected to the use of Instagram may lead to the discovery of additional evidence.  For example, associated and linked accounts, stored communications, photos, and videos may reveal services used in furtherance of the crimes under investigation or services

19

used to communicate with co-conspirators.  In addition, stored communications, contact lists, photos, and videos can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation. Specifically, your Affiant intends to identify accounts possibly used by MOORE and FREEMAN. Additional information obtained may assist your Affiant and law enforcement in determining their involvement in the crimes under investigation.

57.     Based on the foregoing, Meta's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram.  In my training and experience, such information may constitute evidence of the crimes under investigation, including information that can be used to identify the account's user or users.

58.     It is known to your Affiant that individuals engaged in the sale of controlled substances and the illegal possession and use of firearms often engage in those activities consistently or sporadically for long periods of time unless they are incarcerated, or their life circumstances otherwise change. As such, your Affiant is respectfully requesting authorization to obtain six (6) months of records and information from the referenced Instagram account to better ascertain the patterns and enterprises of the persons involved in the described criminal activity.

## CONCLUSION

59.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of violations, or attempted violations, of Title 18 U.S.C. § 922(g)(1) (felon in possession of a firearm and/or ammunition), Title 18 U.S.C. § 924(c) (use or carrying of a firearm in relation to or in furtherance of a drug trafficking crime), and Title 21 U.S.C. § 841(a)(1) (distribution of a controlled substance) may be located in the Instagram account associated with the user name "**professorglockz,**" as described in Attachment A.

60.     Based on the forgoing, I request that the Court issue the proposed search warrant. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving the warrant on Meta.  Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

61.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Special Agent Samuel F. Supnick
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on May 26, 2022.

/s/

The Honorable William E. Fitzpatrick
United States Magistrate Judge
Alexandria, Virginia

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to information associated with the Instagram account with the user name **"professorglockz"** active on, but not limited to, April 6, 2022, that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered at 1601 Willow Road, Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or other information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on or about April 6, 2022 and again on May 12, 2022, Meta is required to disclose the following information to the government for each account or identifier listed in Attachment A:

A.     All business records and subscriber information, in any form kept, pertaining to the account, including:

    1.     Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

    2.     All Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts (including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

    3.     Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

    4.     All information regarding the particular device or devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

    5.     All advertising information, including advertising IDs, ad activity, and ad topic preferences;

    6.     All information about connections between the account and third-party websites and applications;

1

7.  Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers, from November 6, 2021 to May 6, 2022.

8.  All activity logs including IP logs and other documents showing the IP address, date, and time of each login to the account, as well as any other log file information;

9.  Privacy and account settings, including change history; and

10. Communications between Meta and any person regarding the account, including contacts with support services and records of actions taken, including suspensions of the account.

B.  All content (whether created, uploaded, or shared by or with the account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata, from November 6, 2021 to May 6, 2022;

C.  All data and information that has been deleted by the user from November 6, 2021 to May 6, 2022

D.  All content, records, and other information relating to communications sent from or received by the account from November 6, 2021 to May 6, 2022, including but not limited to:

1.  The content of all communications sent from or received by the account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

2.  All records and other information about direct, group, and disappearing messages sent from or received by the account, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

3.  All records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

4.  All associated logs and metadata;

E.  All content, records, and other information relating to all other interactions between the account and other Instagram users from November 6, 2021 to May 6, 2022, including but not limited to:

2

1. Interactions by other Instagram users with the account or its content, including posts, comments, likes, tags, follows (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

2. All users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

3. All contacts and related sync information; and

4. All associated logs and metadata;

F. All records of searches performed by the account from November 6, 2021 to May 6, 2022; and

G. All location information, including location history, login activity, information geotags, and related metadata from November 6, 2021 to May 6, 2022.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

II.     **Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of Title 18 U.S.C. § 922(g)(1) (felon in possession of a firearm and/or ammunition), Title 18 U.S.C. § 924(c) (use or carrying of a firearm in relation to or in furtherance of a drug trafficking crime), and Title 21 U.S.C. § 841(a)(1) (distribution of a controlled substance) involving Ajee WHITTER and his associates, to include but not limited to Quinton MOORE and Delondre FREEMAN, and occurring after November 6, 2021, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

A.      The sale and possession of controlled substances; the sale and possession of firearms and ammunition; the carrying or use of firearms in relation to or in furtherance of drug trafficking;

B.      Lists of customers and related identifying information;

C.      Types, amounts, and prices of drugs and/or firearms trafficked as well as dates, places, and amounts of specific transactions;

D.      Any information related to sources of drugs or firearms (including names, addresses, phone numbers, or any other identifying information);

E.      Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner;

F.      Evidence indicating the account owner's state of mind as it relates to the crime under investigation;

G.      The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s).

H.      The identity of the person(s) who communicated with the account holder about matters relating to the possession and sale of controlled substances and firearms, including records that help reveal their whereabouts.

4

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the ATF may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by Meta Platforms, Inc. ("Meta"), and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Meta.  The attached records consist of _____ [**GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)**].  I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Meta, and they were made by Meta as a regular practice; and

b.      such records were generated by Meta's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Meta in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Meta, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____

Date                                                      Signature

6